385 So.2d 1064 (1980)
Dorothy S. HOFFMAN, Appellant, Cross-Appellee,
v.
Eloise Sue KOHNS, Personal Representative of the Estate of Herbert L. Kohns, Appellee, Cross-Appellant.
No. 79-944.
District Court of Appeal of Florida, Second District.
June 13, 1980.
Rehearing Denied July 15, 1980.
*1065 Curtis J. Timm of Icard, Merrill, Cullis, Timm & Furen, Sarasota, for appellant, cross-appellee.
Geoffrey Morris of Hazen & Morris, Venice, for appellee, cross-appellant.
BOARDMAN, Judge.
The instant appeal and cross-appeal arise out of an order concerning the disposition of the estate of the decedent Herbert L. Kohns. Appellant Dorothy Hoffman is Kohns' niece; appellee Eloise Sue Kohns is his second wife. We affirm in part and reverse in part.
Kohns died on September 13, 1976, at the age of 84. Appellee subsequently filed a petition for administration of Kohns' most recent will, executed on September 26, 1975. After this will was admitted to probate, appellant sought revocation of probate on the ground that appellee had procured the will by undue influence. Appellant also attacked the validity of appellee's marriage to Kohns and Kohns' subsequent revocation of a certain trust.
Following a bench trial, the trial court found that Kohns was legally competent to make the September 26, 1975 will; to enter into a valid marriage contract with appellee, whom he married on September 22, 1975; and to revoke on October 3, 1975, a trust he had created in 1969. The court ruled Kohns' marriage to appellee and his revocation of the trust valid, but ruled the will invalid because of appellee's undue influence upon Kohns. The trial court subsequently granted appellee's petition to be determined Kohns' pretermitted spouse and ruled that she was entitled to Kohns' entire estate. This appeal and cross-appeal followed timely.
On January 16, 1969, Kohns, then over seventy years old, established a revocable trust of which he and appellant were co-trustees. The trust provided that after Kohns' death forty per cent of the trust assets would be distributed to appellant's two children and appellant would have a *1066 life estate in the other sixty per cent with the remainder to her children. The assets Kohns then owned were transferred to the trust.
On July 2, 1969, Kohns executed a pour-over will providing for $5,000 bequests to Robert Strauss and another named individual and three charitable bequests. The remainder of his probate estate was poured into the 1969 trust to be distributed under its terms.
After 1969, Kohns' mental and physical condition gradually deteriorated. He became extremely forgetful, paranoid, and suspicious, expressing distrust of all banks, doctors, trust officers, and others. From 1968 to 1975, Kohns lived alone in rental apartments. Until his stroke in October, 1974, he was able to drive an automobile, but had to have a woman at his bank make deposits and reconcile his checkbook.
When Kohns inherited additional funds in 1972 and 1973, he wanted to put these into the trust and began to think about making some provision for Robert Strauss, an old friend who had become destitute.
On October 13, 1974, Kohns telephoned appellant and her husband Mike Hoffman and requested that they immediately come to Florida because he thought that some of his securities and other papers were missing. The Hoffmans flew to Florida the next day. On October 15, 1974, Kohns and Hoffman inventoried Kohns' safety deposit box and determined that nothing was missing. That same day Kohns and the Hoffmans conferred about a minor change to Kohns' 1969 trust to provide for Strauss. Appellant agreed that she should be eliminated as a life income beneficiary of sixty per cent of the trust and the income from that portion should be paid one-half to Strauss and one-half to her children. Hoffman and Kohns saw Kohns' attorney, Curtis Timm, who was asked to prepare an amendment to the trust incorporating the agreed-upon change and a new pour-over will deleting the bequest to Strauss. Timm had been Kohns' attorney for almost ten years. An appointment was set up for execution of the documents the next day.
After seeing Timm, Kohns and Hoffman returned to Kohns' apartment. Kohns, who had been behaving somewhat strangely, upon seeing that appellant had purchased a supply of food for him, "all of a sudden ... decided that [appellant] had no right to go out and buy food and put it in his refrigerator and cook dinner for him." Kohns then went to his room and refused to come out for dinner, and the appointment with Timm was cancelled. The next day the Hoffmans returned to New York.
On October 25, 1974, Kohns, then age eighty-two, was admitted to the hospital. The treating doctors concluded he was suffering from cerebral arteriosclerosis and senility. Dr. VandePolder, a consulting neurologist, determined on October 26, 1974, that Kohns had acute organic brain syndrome. A patient with this condition is not usually considered competent to perform normal tasks or to make decisions. After his discharge from the hospital, Kohns entered a nursing home.
In December 1974, Kohns refused to stay in the nursing home and was returned to his apartment, but required nurses twenty-four hours a day. In January 1975, because of the cost of twenty-four-hour nurses, Timm's office advertised for and hired live-in housekeepers for Kohns.
Kohns' housekeepers provided him transportation, purchased all of his food, made meals, kept house, wrote checks for his signature, and generally handled his personal and routine financial matters. His checkbook was reconciled and some of his checks for bills were written by Dera Rahn, an employee in the bookkeeping department of his bank.
Kohns was frail and feeble, disoriented at times, forgetful, sometimes hostile and irate, suspicious and paranoid. He was withdrawn at times, sitting for hours staring into space.
Appellant telephoned Kohns monthly, and he was on pleasant terms with her. Appellant's last conversation with Kohns was on September 3, 1975.
*1067 In the last week of August 1975, appellee, age fifty-five, was hired as Kohns' housekeeper. Because Kohns was incapable of paying or making an agreement to pay his housekeepers, on September 9, 1975, appellee brought Kohns to Timm's office and told Timm that she had worked for over a week and had not been paid. Timm made arrangements with Dera Rahn to have appellee paid $200 for the ten days she had worked and thereafter to be paid weekly. Timm also asked Kohns if he wanted to execute the pour-over will and amendment to his trust that had been prepared on October 15, 1974. These two documents were then executed. Timm certified that at the time of the execution of the will Kohns was of sound mind and memory.
Up to September 9, 1975, the relationship between Kohns and appellee was solely one of employer and housekeeper/nurse. According to appellee nothing significant occurred between September 9 and September 22, 1975, and there was no change in their relationship during this period.
On September 1, 1975, appellee took Kohns to his bank, and his safety deposit box was closed. One previous housekeeper testified that Kohns was not capable of closing a safety deposit box and transferring its contents without assistance. The box contained all of Kohns' assets, including at least $40,000 worth of bearer bonds.
On September 19, 1975, appellee drove Kohns to Wauchula, applied for a marriage license, and obtained the required blood tests for both of them. On Monday, September 22, 1975, appellee drove Kohns back to Wauchula and had a marriage ceremony performed there by a notary public.
The next day, September 23, appellee took Kohns to attorney Dick Lee to have a new will drawn making her the sole beneficiary. She had previously used Lee as her attorney, whereas Timm had been Kohns' attorney for ten years. The new will was executed in her presence on September 26, 1975. The attorney who witnessed the will testified that Kohns was alert and responsive. The other subscribing witness testified that Kohns was in command of his faculties and knew what he was doing.
Immediately after the marriage, appellee moved Kohns out of his apartment into a room in her home. Within a week after the marriage, appellee took Kohns to his bank and arranged through Dera Rahn for the withdrawal of $31,405.72 from a Manufacturers Hanover Trust savings account which Kohns had had for many years, transferring all of the funds into joint accounts or joint certificates of deposit in the names of Kohns and appellee.
At that time, it was discovered that the securities in the 1969 trust could not be transferred without the consent of the co-trustee or an amendment or revocation of the trust. On October 3, 1975, appellee took Kohns back to Lee's office, at which time Kohns signed a one-paragraph revocation of the 1969 trust. Marion Eichler, a secretary with the law firm, testified that in her opinion Kohns was in command of his faculties.
During October, November, and December, 1975, all but two issues of securities owned by Kohns individually or in the trust were transferred either to appellee or to appellee and Kohns as tenants by the entireties or joint tenants with right of survivorship. The transferred securities were returned to appellee's post office box. The transfer agents refused to transfer two issues in trust without appellant's signature.
The Hoffmans attempted to contact Kohns on September 27, 1975, but were unable to contact him. They eventually found out that he had been moved to appellee's home. They called there several times in September, October, and November, 1975, attempting to contact Kohns, but each time they were told that he was indisposed or out walking; they were unable to talk to him. Appellee assured them Kohns was feeling much better, but never indicated she had married Kohns. The Hoffmans also wrote letters to him that he apparently never received.
Kohns and appellee did acknowledge their marriage to Dera Rahn and several friends and neighbors.
*1068 Dr. Garber, Kohns' regular physician, saw him for the last time in October, 1975. Kohns was brought to Garber's office by appellee, who indicated she was his housekeeper. Kohns did not mention his marriage. Dr. Garber testified that Kohns was incompetent and had been for some time and that in 1975 "he was incompetent to make any major decisions based on many years of taking care of him and seeing him throughout the years deteriorating."
Dr. Satya, appellee's physician, who first examined Kohns on October 1, 1975, testified that he felt Kohns was competent. However, he indicated that he would change his opinion if the medical history given to him was materially incorrect. The medical history given to Dr. Satya on October 1, 1975, indicated that Kohns had been married about one and a half months, had stopped smoking one year ago, and had last been hospitalized in October, 1974. Dr. Satya later prescribed drugs for Kohns' erratic behavior at appellee's request.
In late November, 1975, Kohns was hospitalized for prostate surgery. The nurses' notes, both those made before and those made after the operation, indicate that he was in a confused mental state.
In July, 1976, Kohns underwent a hernia operation. During the operation, he had a stroke and lapsed into a coma. He was comatose thereafter until he died on September 13, 1976. The death certificate indicated that Kohns had suffered from hardening of the arteries of years duration.
The evidence overwhelmingly supports the court's determination that the September 26, 1975, will was procured by undue influence. Moreover, we find merit in appellant's contention that the trial court's ruling that the revocation of the 1969 trust and the subsequent transfer of the trust assets to appellee were not procured by undue influence is contrary to the evidence and the court's own factual findings.
Although we have found no Florida case directly referring to the revocation of a living trust, in Rich v. Hallman, 106 Fla. 348, 143 So. 292 (1932), the Florida Supreme Court recognized that a lifetime transfer in the nature of a gift to a nurse was invalid as having been procured by undue influence. The court also held that "the degree of proof necessary to invalidate a will is much greater than that required to set aside a gift inter vivos." 106 Fla. at 352, 143 So. at 293.
The trial court found that Kohns was "a very lonely, frustrated and extremely troubled octogenarian in poor mental health, probably neurotic but not psychotic nor legally incompetent," but further found:
However, it further appears that the Respondent did engage in a course of conduct before the marriage and continued it thereafter so as to unduly influence said Herbert L. Kohns so as to completely ignore his prior wishes, his relations to the persons who were or should or might have been the objects of his bounty. Such conduct completely dominated the thinking of the deceased, kept him isolated and out of contact with his family, and the resulting persuasion, coercion and excessive influence dominated his willpower so that he provided only for the Respondent in the will in question.
The revocation of the trust was executed on October 3, 1975, just seven days after the execution of the September 26, 1975, will found to have been procured by undue influence.
The evidence establishes that appellee completely dominated Kohns both before and after September 26, 1975, the date the new will was executed, by taking control of all of his business affairs, taking over the writing of checks and balancing of his checkbook, and changing his attorney, doctor, accountant, and stockbroker. The systematic transfer of all of Kohns' assets to appellee or into joint tenancy is further evidence of her undue influence. There is no evidence that Kohns made a single independent decision after the marriage.
Kohns' marriage to a woman thirty years younger than he, whom he had known for less than a month; the complete cancellation *1069 of his entire long-standing estate plan; and the changing of his doctor of over fifteen years, his lawyer of ten years, his accountant, and his stockbroker, all within a few weeks, are highly unusual, and the trial court quite properly found that these actions were taken as a result of the undue influence of appellee. The revocation of the trust was part of a continuing pattern begun immediately after the marriage. The trial court could not reasonably find otherwise.
Our holding with respect to the revocation of the trust does not affect the validity of the Kohns' marriage. A marriage to which the consent of one of the parties is obtained by undue influence is merely voidable. Tyson v. State, 83 Fla. 7, 90 So. 622 (1922). Consequently, it cannot be attacked upon this basis after the death of either of the parties. Annot., 47 A.L.R.2d 1393, 1407 (1956); Annot., 91 A.L.R. 414 (1934). Cf. Savage v. Olson, 151 Fla. 241, 9 So.2d 363 (1942), which held that a showing of gross fraud could be a basis for declaring a marriage void after the death of the defrauded spouse. On the other hand, a marriage may be posthumously set aside as being void because of the mental incompetency of one of the marriage partners. Kuehmsted v. Turnwall, 103 Fla. 1180, 138 So. 775 (1932). Here, however, while the evidence was conflicting, it was sufficient to support the court's conclusion that Kohns was competent to marry appellee.
This leaves remaining the question of whether appellee was entitled to those of the decedent's assets which were not already in the trust before he died. The answer appears to lie in the application of Section 732.301, Florida Statutes (1975), which reads:
732.301 Pretermitted spouse.  When a person marries after making a will and the spouse survives the testator, the surviving spouse shall receive a share in the estate of the testator equal in value to that which the surviving spouse would have received if the testator had died intestate, unless:
(1) Provision has been made for the spouse by marriage contract;
(2) The spouse is provided for in the will; or
(3) The will discloses an intention not to make provision for the spouse.
The share of the estate that is assigned to the pretermitted spouse shall be obtained in accordance with s. 733.805.
Because the court set aside Kohn's September 26, 1975, will, his last valid will was the one which he executed on September 9, 1975, prior to his marriage to appellee. Even though she improperly influenced him to execute the September 26 will, once that will was revoked they were in the same posture as if no will had been made following the marriage. Therefore, since there was no marriage contract and no reference to appellee in the September 9 will, she was entitled under the statute to her intestate share, which would be Kohn's entire estate because he died without lineal descendants.
We reverse the trial court's ruling which upheld the revocation of the 1969 trust. In all other respects we affirm the judgment and remand the case for proceedings to compel the return of the appropriate assets to the trust and for such other matters as are consistent with this opinion.
GRIMES, C.J., and DANAHY, J., concur.